**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
ATLANTA DIVISION

| | | |
|---|---|---|
| ARGOS USA LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. _____ |
| | ) | |
| CHRISTOPHER YOUNG, | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| SOUTHEAST READY MIX, LLC | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>COMPLAINT</u>

### INTRODUCTION

1.    For over ***five years***, from 2011 to 2016, Defendant Christopher Young ("Young") systematically and secretly copied trade secrets from his employer, Plaintiff Argos USA LLC[1] ("Argos").

2.    Young stole this confidential, proprietary business information using spy-novel espionage methods that were designed to avoid detection. For example, he used cameras to photograph computer screens so there would be no electronic trail of his activities; he secretly recorded hundreds of hours of business

---

[1] Formerly known as Argos Ready Mix LLC.

conversations with no one's knowledge or consent; and he stole business documents from a company vehicle and slipped them into his bag on the day he was terminated.

3.     By the time Young's employment was terminated, he had stolen ***thousands of documents*** containing some of Argos' most critical technical and financial trade secrets – all without Argos' knowledge.  Furthermore, because Young photographed documents rather than download them or email them to an outside email address, Argos was not able to detect his theft during his employment.

4.     Both during and after his employment with Argos, Young used the trade secrets he stole to his advantage, and to the advantage of Argos' competitor.

5.     For instance, from approximately 2011-2016, Young secretly gave these trade secrets to attorneys to help his close friends and his current employer, Defendant Southeast Ready Mix LLC ("Southeast"), sue Argos.  These attorneys knew that Young had stolen this confidential information from Argos.

6.     In addition, Young gave these trade secrets directly to Southeast, which is a direct competitor of Argos.

7.     Young also began employment negotiations with Southeast in December 2015, while still working for Argos and while continuing to steal Argos' confidential, proprietary information.  Young began working for Southeast just weeks after his termination from Argos, and now holds the title of President.

8.    Young, Southeast, and their lawyers have not only refused to return the stolen information to Argos, but have flagrantly used that information to foment multiple claims, charges and lawsuits against Argos.

9.    Southeast, Young, and their lawyers continue to hold Argos' confidential information hostage.

10.    Argos files this action to recover its intellectual property and confidential, proprietary business information, prevent further erosion of its business, and seek redress for the substantial damage it has suffered.

## THE PARTIES, JURISDICTION AND VENUE

11.    Argos is a limited liability company organized under the laws of Delaware.  Its headquarters and principal place of business are located in Alpharetta, Georgia.  Argos sells ready mix concrete to contractors, builders, and finishers for use in commercial and residential applications in a number of states, including Georgia and South Carolina.

12.    Young is a natural person and a citizen of South Carolina.  Young lives in Bluffton, South Carolina.  Young worked for Argos as a sales manager in Savannah, Georgia, from May 2011 until July 2016.

13.    Southeast is a domestic limited liability company incorporated in the State of Georgia and with its principal place of business in Savannah, Georgia.

Southeast is a ready mix concrete supplier that provides concrete for residential and commercial projects in Savannah, Georgia; Statesboro, Georgia; Bluffon/Hilton Head, South Carolina; and surrounding areas. Southeast competes with Argos, and now employs Young as one of its Presidents.

14.     This Court has personal jurisdiction over Defendant Young because Young committed tortious acts in Georgia. *See* O.C.G.A. § 9-10-91(2).

15.     This Court has personal jurisdiction over Defendant Southeast because Southeast committed tortious acts in Georgia and regularly transacts business in Georgia. *See* O.C.G.A. § 9-10-91(2).

16.     This action arises in part under the Computer Fraud and Abuse Act (18 U.S.C. § 1030(g)) and the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836). This Court has subject matter jurisdiction over those claims under 28 U.S.C. §§ 1331 and 1343.

17.     This action also arises in part under the laws of Georgia and South Carolina. This Court has subject matter jurisdiction over Georgia state law and South Carolina state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## RELEVANT BACKGROUND FACTS

### I.    Argos' Trade Secrets

19.    Argos is a leader in the concrete industry in the areas of innovation and sustainable business practices.  Argos conducts a number of business programs related to the company's goal of conducting business in a sustainable manner.

20.    Argos has invested significant time and resources into researching and developing proprietary concrete mixes that are both economically affordable and more environmentally friendly than traditional concrete mixes.

21.    Because builders may use these proprietary mixes during construction to earn credits towards Leadership in Energy and Environmental Design ("LEED") certification, many of Argos' customers recognize the intrinsic value of Argos' mix designs.

22.    Because Argos has invested significant time and resources into developing concrete mix designs that its customers value, those designs are also valuable to Argos.

23.    Conversely, if the confidential information or details related to Argos' proprietary mixes became known to Argos' competitors, those competitors could use that information to develop and market competing products to Argos' customers.

24.   Part of the value Argos derives from its proprietary concrete mixes is based on that information not being known to its competitors.

25.   In addition to Argos' proprietary concrete mixes, its confidential customer, sales and marketing information is likewise critical to Argos' business.

26.   Driven in substantial part by Argos' confidential and proprietary internal data and research, Argos has developed a unique approach to marketing certain concrete mixes to its various customers.  Both Argos and its shareholders derive economic value from this business strategy to market, promote, and sell Argos' products, thereby increasing revenues.

27.   Part of the value that Argos derives from its confidential marketing strategy is based on Argos' confidential and proprietary information not being known to its competitors.  If confidential information related to Argos' business strategy became known to Argos' competitors, those competitors could leverage that information to undercut Argos' sales or otherwise interfere with Argos' share of the market.

28.   Argos also generates and maintains a significant amount of information about its material suppliers in the course of its business.  For example, both to ensure that its concrete products remain competitive and to reduce the carbon footprint of its products, Argos contracts with local suppliers for many of the ingredients used in

manufacturing its concrete.  These local contracts play a significant role both in Argos' production costs and in its pricing strategy.

29.    In the course of selling its concrete, Argos also generates and maintains internal customer lists, populated by confidential and proprietary data and research on each customer's purchasing history.

30.    Argos also maintains confidential financial information generated internally and valuable to Argos because it is not known outside Argos and specifically by Argos' competitors.  For example, Argos maintains documents and data reflecting Argos' costs and profit margins for each of its various products, including its proprietary concrete mixes.

31.    All of this information – the proprietary concrete mixes, the proprietary marketing strategy, the proprietary information concerning Argos' suppliers, the proprietary information about Argos' customers, and Argos' confidential financial information – is valuable to Argos, and would be less valuable if generally known among Argos' competitors.

## II.    Argos Protects its Confidential Proprietary Information

32.    To preserve the value of its confidential, proprietary, and trade secret information, Argos has taken a number of steps to protect it.

33.     For example, each of Argos' employees is provided with a copy of the company's Electronic Communications Policy ("the ECP"), which is included as an appendix to the Argos USA Policy Manual.  All employees are required to read, acknowledge, and agree to abide by the ECP as a condition of their employment at Argos.

34.     The ECP specifically informs employees that all information created or stored on Argos' computer systems is Argos' property.

35.     The ECP reiterates this point, informing employees that intellectual property laws apply to information available on Argos' information systems and computer network ("the Network").

36.     The ECP advises employees that "Duplication or transmission of such material may not be undertaken without express authorization from the Network Administrator."

37.     The ECP's standards for using the Network require employees to "take reasonable measures to avoid the public disclosure of Company [Argos] information," stating that company information "should not be accessed, modified, or disclosed except by authorized employees in the course of their employment duties."

38.     The ECP further states that "Confidential and privileged attorney-client communications or work product may at times be transmitted or stored on Company network or other systems.  Employees who receive or have access to such privileged information should not disclose or distribute such information, except as directed by legal counsel for the Company."

39.     Young received, reviewed, and signed the ECP, agreeing to abide by its terms.

40.     The Argos USA Policy Manual, to which the ECP is appended, also advises employees that stealing, misappropriating, or removing company property from the premises is grounds for termination.

41.     The Argos USA Policy Manual further advises employees that they may not use or disclose confidential information after their employment ends.

42.     Argos provided Young with a copy of the Argos USA Policy Manual, and Young maintained a copy of the Argos USA Policy Manual in his possession throughout the duration of his employment.

43.     In addition, all of Argos' computers are password protected, and access to the Network is restricted to employees and Argos' agents.

44.     When an employee resigns or is terminated, Argos immediately secures that employee's electronic devices so that he or she can no longer access that information.

45.     Argos also takes additional steps to protect especially sensitive information.   For example, Argos restricts access to information related to the research and development of its proprietary concrete mix designs, and access to this information ordinarily is limited to employees on a need-to-know basis.

## III.   Young's Employment with Argos and Young's Access to Argos' Trade Secrets

46.     In May 2011, a building materials company known as Lafarge sold its cement and concrete business assets, which were based in the southeastern United States, to Cementos Argos, S.A.  Those assets became the property of Argos Ready Mix LLC and Argos Cement LLC, which at the time were wholly-owned subsidiaries of Argos USA Corp.—a subsidiary of Cementos Argos, S.A.

47.     On July 1, 2016, Argos USA Corp. changed its name to Argos North America Corp.

48.     Also on July 1, 2016, Argos Ready Mix LLC and Argos Cement LLC merged to form Plaintiff Argos USA LLC.

49.     Plaintiff Argos USA LLC continues to own and operate the facilities purchased from Lafarge.

50.     A substantial number of former Lafarge employees joined Argos Ready Mix LLC and continued in their former positions.  Among these new employees was one of Lafarge's sales managers, Chris Young.

51.     Young was a residential sales manager in Savannah, Georgia when Argos acquired Lafarge, and Young continued in this position after Argos acquired Lafarge's facilities.

52.     As Argos' sales manager, Argos afforded Young a significant amount of trust, responsibility, and authority.  For example, Argos empowered Young to enter into sales contracts on the company's behalf.

53.     Young also regularly participated in meetings of the company's regional review board for the Savannah, Georgia area.  As a board member, Young had access to a wide array of confidential information about personnel decisions, budgetary and finance decisions, service and quality issues, and supplier information.

54.     But the confidential and proprietary information to which Young had access was not limited to these materials.

55.     During his employment at Argos, Young did not permanently work out of any particular office or plant.  Although Young typically worked out of Argos' office in Pooler, Georgia, he also worked out of Argos' plants in Richmond Hill,

Georgia and Hilton Head, South Carolina and Young attended meetings at Argos' corporate headquarters in Alpharetta, Georgia.

56.    In September 2013, Argos received notification from a concrete finisher in the Savannah area, claiming the concrete finisher had identified "dusting" issues (where the surface of the concrete produced excessive dust through normal use) with slabs made using batches of one of Argos' proprietary concrete mixes.  In his capacity as Argos' sales manager for the Savannah region, Young was naturally situated to act as a liaison between the company, its customer concrete finishers, and the homeowners who claimed to have experienced dusting.

57.    Young investigated and evaluated slabs that allegedly manifested dusting issues and negotiated with third parties for products and services to remediate those issues.  Young also oversaw remediation efforts and exercised authority to authorize payment of invoices to correct concrete dusting issues.

58.    Because Argos trusted Young enough to include him on teams that addressed customer complaints, Young had access to documents describing details of every phase of Argos' proprietary concrete mix design and manufacturing process.

## IV.    Young's Theft of Argos' Trade Secrets

59.    Unbeknownst to Argos, Young began stealing information from the company as early as 2011.   Young used a variety of methods to take Argos' confidential information:   Young secretly printed documents in his office; he used digital cameras to photograph documents, emails, and attachments on computer screens; he used audio-recording devices to record private conversations without anyone else's knowledge or consent; and he stole documents from his own employee personnel file, including documents related to Argos' method for calculating sales bonuses.   Young took these actions in secret and without authorization from Argos.

60.    In addition, after other Argos employees collected the delivery forms and mix design information for certain customers, Argos entrusted Young with access to those files to use in addressing customer complaints on the company's behalf.   Over time, many of the documents from those files went missing.   Argos initially reasonably assumed that one or more employees inadvertently misplaced those documents.   However, it is now apparent that Young purposefully removed those documents from Argos' files.

61.    Because Young stole the documents and information using methods to avoid detection, Argos was unaware of, and not able to detect, Young's theft during his employment at Argos.

62.    It was not until well after June 29, 2017, that Young's misappropriation of Argos' confidential and proprietary information came to light and was revealed to Argos.  Since that date, Argos has conducted an investigation to learn of the scope of Young's theft, including through the use of discovery in several cases based on the information he stole.

63.    In response to Argos' subpoena in the product liability action (explained in more detail below), Young produced more than 5,000 documents, including photographs, video recordings, audio recordings, emails, spreadsheets, and internal documents which he had stolen from Argos.  These documents and materials include, but are not limited to:

     a.    <u>Argos' sales and customer data</u>: **these documents include internal customer data, annual sales reports, average sales prices, average profit margins, total discounts Argos confidentially offered to certain customers to compete for their business, and spreadsheets that track the status of Argos' bids to other companies.**  These materials identify jobs that Argos bid for and lost, jobs Argos bid for and won, and Argos' competitors' prices offered in competition for those same jobs.  As such, these lists and spreadsheets contain highly sensitive, proprietary, and confidential

14

information.  Specifically, these lists and spreadsheets identified Argos' "top 10 customers by volume" and "top 15 customers by volume" in multiple markets and regions.

b. Market research documents: these documents comprise spreadsheets that track developments and sensitive pricing and output information in Argos' markets and target markets, with information developed internally by Argos related to Argos' sales, market research, and marketing strategies.  **For example, Young stole an annual sales report that specified how much concrete each of Argos' customers ordered in the preceding year and the average sales price each customer had paid.**

c. Specific sales documents: these materials include copies of purchase orders and contracts from specific sales, confidentiality/non-disclosure agreements, and mix submittals submitted to customers and/or third parties.

d. Mix information: Young stole proprietary concrete mix information, including a master mix list describing the constituents for Argos' concrete products.  The mix information that Young stole, including, but not limited to batch comparison reports, ***would show a***

***competitor each of the ingredients Argos used to make its concrete***

***products, and, thus, allow a competitor to copy Argos' proprietary***

***mixes***.  One document that Young stole stated on its face that, "The

contents of this packet, with particular consideration in regard to the

mix designs themselves, are considered proprietary in nature and are

to be treated as confidential."

e. <u>Argos' employment and human resources documents</u>: these

materials include information related to Argos' employment

policies and sales procedures, and performance reviews.

f. <u>Mix complaints and remediation efforts</u>: these materials include

internal Argos communications related to dusting issues some

customers had experienced, and communications between Argos

employees and customers or homeowners.

g. <u>Batch comparison reports</u>: these documents compare the weight and

volumes of each specific ingredient or mixture used in creating a

batch of concrete against target weights and volumes established by

the mix design and ***reveal all or nearly all information necessary***

***to create a competing mix.***

h. <u>Video recordings and pictures from dusting remediation</u>.

i. <u>Audio recordings of conversations between Argos employees</u>: Young surreptitiously recorded his conversations with other Argos employees on his mobile phone.

j. <u>Confidential and/or privileged communications with Argos' General Counsel</u>: these documents and communications related to safety concerns, remediation efforts, and privileged company information and strategy.   Young photographed privileged and confidential emails with the company's General Counsel and passed those photographs on to his lawyers.

k. <u>Delivery tickets:</u> Argos provided these tickets to builders, finishers, and other customers upon delivery of batches of concrete.   Each delivery ticket describes what mix was delivered, relevant plastic properties at the time of delivery, whether any additional water was added at the time of delivery, and whether any additional materials were used.

64.   In addition to the above material which was disclosed through the subpoena, Young also stole documents containing financial information, including some which reflected Argos' profit margins for its various products.

65.    Young also stole spreadsheets identifying the total yardage sold in certain divisions over time compared to the number of building permits issued in those same divisions.

66.    Young also stole documents from his own personnel file, including documents related to Argos' method for calculating sales bonuses.

67.    Young also stole other sensitive, proprietary information over which Argos maintains confidentiality to ensure that competitors cannot use the information to harm Argos' business.

68.    During a deposition on November 20, 2017, in the products liability case:

    a.  Young admitted that he copied or photographed Argos' proprietary, confidential documents during his employment;

    b.  Young admitted that he provided the confidential documents and materials to his attorney on an intermittent basis during his employment with Argos;

    c.  When asked "did you consider any of the information, documents, e-mails, correspondence, documents you either made copies of or took pictures of while you worked for Argos, did you consider any

of that to be proprietary?",  Young answered, "I would say some of them would be."

d.  Young admitted he never told Argos he was stealing proprietary information from the company, and that he never attempted to return any of the information he stole back to Argos.

## V.   Young's Use Of Argos' Trade Secrets

69.    With Argos' stolen confidential, proprietary, and trade secret information in his hand, Young has set out to willfully harm Argos and benefit its competitor.

### A. The *Qui tam* Action

70.    Beginning in 2011, Young erroneously suspected that Argos had engaged in illegal price fixing, and he decided to take the law into his own hands to punish Argos for his ill-conceived belief.

71.    Young passed stolen Argos information to Raymond Moss ("Moss"), a lawyer at the firm of Moss & Gilmore LLP, which is based in Fulton County, Georgia.  Moss knew that Young had stolen these confidential documents from Argos, but Moss nevertheless used the stolen materials to file a *qui tam* action on Young's behalf.

72.     On or about April 2013, Young, through Moss, filed the *qui tam* action on behalf of himself, as relator, as well as the United States and the State of Georgia, styled *United States ex rel. Lafarge, S.A., et al.*, No. 4:13-cv-00095-WTM-GRS (S.D. Ga.).

73.     Both the United States and the State of Georgia independently investigated Young's claims and declined to pursue any action against Argos.

74.     On July 15, 2016, Moss filed a motion to voluntarily dismiss the *qui tam* action.  Moss also filed a contemporaneous motion requesting the Court seal the complaint for at least three more years.  *See United States ex rel. Lafarge, S.A., et al.,* No. 4:13-cv-00095-WTM-GRS (S.D. Ga.), ECF No. 34, 35.  If successful, this motion would have prevented Argos from learning of Young's theft.

75.     The Court denied the motion to seal the complaint that same day, although it granted Young's motion to voluntarily dismiss his claims.  *See* Order Granting Motion to Dismiss, *United States ex rel. Lafarge, S.A., et al.*, No. 4:13-cv-00095-WTM-GRS (S.D. Ga.), ECF No. 36.  However, the complaint was not unsealed at that time.

76.     On July 26, 2016, Michael Moore of the law firm Pope McGlamry PC ("Moore") filed a motion for reconsideration of the dismissal order.  *See* Motion for Reconsideration, *United States ex rel. Lafarge, S.A., et al.*, No. 4:13-cv-00095-

WTM-GRS (S.D. Ga.), ECF No. 38.  The Court never ruled on this motion, and on April 10, 2017, Moore withdrew the motion on Young's behalf.  *See* Motion to Withdraw Motion for Reconsideration, *United States ex rel. Lafarge, S.A., et al.*, No. 4:13-cv-00095-WTM-GRS (S.D. Ga.), ECF No. 40.

77.    On June 29, 2017, the Court ordered that the case be unsealed.  *See* Order Directing Clerk to Unseal, *United States ex rel. Lafarge, S.A., et al.*, No. 4:13-cv-00095-WTM-GRS (S.D. Ga.), ECF No. 41.

**B. <u>The Products Liability Action</u>**

78.    Although Young's unfounded *qui tam* action came to an end, Young continued to use Argos' proprietary and confidential information to harm the company.

79.    While the *qui tam* case was pending, Young continued to copy and record Argos' proprietary and confidential documents surreptitiously.  Young claims he took these wrongful actions to support his *qui tam* action.  However, Young stole documents that were unrelated to the allegations in the *qui tam* action.  For example, the information Young stole about the customer dusting issues had nothing to do with the conspiracy theories underlying Young's *qui tam* action.

80.    Nevertheless, Young continued to misappropriate Argos' confidential information for his own purposes, systematically copying whatever he could lay his

21

hands on before secretly communicating it to Moss to support further actions against Argos.

81.     For example, Young's stolen documents helped his close friend, Daniel Nunn ("Nunn"), and his attorney, Moss, file a product liability action.

82.     On or about May 6, 2016, a number of homeowners—including Nunn—filed a product liability action against Argos based on several alleged dusting issues that Young had investigated.  This action is styled *Jim and Becky McGaffin, et al. v. Cementos Argos, S.A., et al.*, No. 4:16-cv-00104-LGW-GRS (S. D. Ga.)

83.     The class action plaintiffs were represented by Young's lawyer, Moss, as well as by Moore.

84.     Young turned thousands of the documents he stole from the company over to Moss and Moore so that they could sue Argos.

85.     Argos has learned, for instance, that Young photographed copies of emails he sent to Argos' General Counsel describing investigations of customer complaints that he was directed to conduct in anticipation of litigation.  Young then provided copies of those privileged communications and related work product to Moss and Moore.

C. **Young's Secret Negotiations with Southeast, Termination from Argos, and Employment with Southeast**

86.    While still systematically stealing Argos information and property, Young began to communicate with Argos' competitors about other employment opportunities.

87.    In approximately December 2015, Young met with Southeast's founders and owners, Mark Turner ("Turner") and Jason Wells ("Wells"), for dinner at a South Carolina sports bar.  At that dinner, Turner and Wells expressed their interest in hiring Young to work for Southeast.  Turner and Wells continued their overtures to Young after that dinner.

88.    At some point between the December 2015 dinner and July 2016, Young again met with Turner for breakfast with the express purpose of discussing Young's potential employment at Southeast.  During that same timeframe, Turner formally offered Young a job at Southeast.

89.    On July 7, 2016, Argos informed Young that the company had decided to terminate his employment because it had lost confidence in his management style and ability.

90.    In Young's termination meeting, Mike Beer ("Beer"), Argos' Director of Human Resources, requested that Young immediately return all of the company's property, and Beer collected the keys to Young's company truck, a credit card, and

a gas card.  Young told Beer he would return the company's property, but said that he would like to clean his personal belongings out of the vehicle first.

91.    Beer presented Young with two severance agreements.  One of those agreements offered Young a six-month severance package and included a non-compete clause.  The other agreement included a more limited, three-month severance package but did not include a non-compete clause.  Beer reviewed the severance agreements' provisions with Young.

92.    Beer reviewed a "Confidential Information" provision in the severance agreement with Young that listed the following materials, among others, as confidential information: "Argos' methods of operation, names of Argos' customers and prospective customers, Argos' customers' financial or other confidential information, Argos' pricing information, Argos' financial information and projections, Argos' marking data and information, Argos' business information and plans, Argos' business practices and processes, and personnel data on Argos' employees/associates."

93.    In addition, Beer reviewed a provision in the severance agreement titled "Return of Argos Property," which directed Young to "deliver to Argos all Argos property, including, but not limited to, all Argos documents, information and data

and all copies thereof, whether in electronic or hard copy form, policy manuals, reports, notes, equipment, credit cards, computers, keys, or computer disks."

94.    Young acknowledged that he had reviewed similar documents with other employees during their terminations, and further acknowledged that he understood the terms and his obligations as reflected in the severance agreements.

95.    After reviewing the severance agreements with Young, Beer asked for Young's laptop, his username, and his password in order to secure his electronic devices.

96.    Beer then called an Uber to take Young home before escorting him outside to clean his belongings out of the company vehicle.  Unbeknownst to Beer, Young retrieved a sheaf of Argos' confidential documents that he had hidden in the truck's console and took them with him as he departed in an Uber.

97.    Young, knowing he had stolen thousands of Argos' documents containing confidential information, refused to sign either severance agreement.

98.    Shortly after his termination from Argos, Young accepted employment with Southeast.

99.    On information and belief, Young and Southeast Ready Mix have used Argos' stolen and misappropriated information to compete with Argos.  Southeast sells ready-mixed concrete that shares certain design characteristics with Argos' own

proprietary mix designs and on information and belief, Young and Southeast used the information misappropriated from Argos to help develop and refine their own concrete mix designs.

100.   Young admitted during his November 20, 2017 deposition that Southeast and Argos compete for the same customers and are bidding against each other for the same work.  Young also admitted during his deposition that customers have moved their business from Argos to Southeast.

101.   Among Argos' top 11 customers in 2016, five of those customers did not buy any concrete from Argos in 2017.  Volume from two more of Argos' top customers declined by more than 60% and 80%, respectively, from 2016 to 2017.

102.   On information and belief, Young used Argos' confidential and proprietary information, which Young stole and misappropriated during his tenure, to help Southeast compete against Argos.

**D.   <u>Southeast Used Information from Young to File an Antitrust Action</u>**

103.   Young instructed Moss and Moore to transfer many of the documents he stole to another attorney, Aaron R. Gott ("Gott").  Gott is an associate at Bona Law P.C., a California law firm.  Gott and other lawyers at Bona Law P.C. represent

Southeast.  Upon information and belief, Young directed Moss to send the stolen materials to Gott at some time from July 2016 through September 2016.

104.   Young admitted during his November 2017 deposition that the documents he stole are now in the possession of Gott and Southeast.

105.   On July 24, 2017, Southeast filed an antitrust action in the U.S. District Court for the Northern District of Georgia styled *Southeast Ready Mix, LLC v. Cementos Argos, S.A., et al*.  The antitrust action is based on many of the same allegations that Young unsuccessfully raised in his aborted *qui tam* action.

106.   Gott and Jarod Bona of Bona Law P.C. represent Southeast in the antitrust action.  Gott sent a copy of Southeast's draft antitrust complaint to Argos on June 7, 2017—well before the *qui tam* action was unsealed.  Upon information and belief, Gott and Jarod Bona relied on documents that Young stole from Argos to draft the antitrust action.

## VI.   Argos' Discovery of Young's Theft

107.   After June 29, 2017, when Young's unsuccessful *qui tam* action was unsealed by the Court in the Southern District of Georgia, Argos learned that Young may have misappropriated Argos' confidential and proprietary information.

108.   Argos began investigating the potential scope of the confidential information that Young may have stolen.  This investigation was hampered by the

means Young used to copy and or duplicate Argos' documents.  Argos nevertheless learned that Young copied or duplicated documents during his employment with Argos.

109.   Argos did not learn the extent of Young's theft and misappropriation until Young produced thousands of documents in response to Argos' subpoena in the product liability action.

110.   Argos did not learn about the covert methods that Young utilized to steal its proprietary information until Young was deposed on November 20, 2017 in the product liability action.

111.   In the face of requests from Argos for the return of its proprietary information, Young's lawyers, Moss and Moore, have admitted that their law firms have retained a substantial number of documents that Young stole from Argos.  In a letter dated December 8, 2017, Moore admitted that "Mr. Young emailed our firms photos, videos, recordings, and copies of Argos documents."

112.   Although thousands of Argos' stolen documents were produced in the products liability action, Moore acknowledged that his law firm and Moss's law firm had "withheld materials [received] from Mr. Young that relate to the *qui tam* lawsuit, antitrust lawsuit, and any other legal matter not involving [the product liability action]."

113.   Moore also claimed that "many of these materials are further protected by a common-interest, joint-prosecutorial privilege/agreement with the government," despite the fact that the government had expressly declined to intervene in Young's abandoned *qui tam* action against Argos.

## COUNT ONE
Defend Trade Secrets Act of 2016 (Against Young and Southeast)
18 U.S.C. § 1836

114.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

115.   Argos is in the business of selling a number of products, including ready-mix concrete, in interstate commerce.

116.   Argos sells these products in a number of states, including Georgia and South Carolina.

117.   In the course of its business operations, Argos has developed a substantial amount of information that is both confidential and valuable in relation to its products.

118.   This information includes technical and nontechnical data, formulae, product mixes, methods, techniques, and production plans related to its research, design, development, and manufacture of proprietary branded cement and concrete mixes.

119.   The information also includes confidential marketing strategies, financial data, financial plans, and lists of actual or potential customers and suppliers.

120.   This confidential information is not commonly known by or available to the public.

121.   The confidential information is not readily ascertainable by reasonable means.

122.   Argos derives actual or potential economic value from the information not being generally known to others who might derive economic value from its use.

123.   Keeping this information confidential gives Argos a competitive edge in its industry and market.

124.   Argos takes reasonable steps to secure the information's confidentiality.

125.   Employees are required to take steps to ensure that Argos' confidential information is not made available outside the company.

126.   Argos expressly prohibits its employees from copying the company's confidential proprietary information without a Network Administrator's prior affirmative authorization.

127.   Argos restricts access to the Network to authorized employees.

128.   When an employee is terminated, Argos immediately seizes and secures the employee's company-issued electronic devices to prevent his or her continued access to the Network.

129.   Argos limits who may access especially sensitive documents.

130.   Young stole, and without authorization, misappropriated Argos' trade secrets.

131.   Young downloaded or photographed, copied, or otherwise duplicated Argos' trade secrets.

132.   Young delivered, communicated, or otherwise conveyed Argos' confidential and proprietary information to Moss, who stood to financially benefit from the stolen information by working with Argos' customers to bring lawsuits against Argos.

133.   Moss knew Young had acquired Argos' confidential information through improper means.

134.   Delivering the documents to Moss also enabled Young to try to conceal those trade secrets he had obtained by shielding them behind the veneer of attorney-client privilege.

135.   Young eventually delivered the documents to one of Argos' competitors, Southeast, through that company's attorney, Gott.

136.   Gott knew that the documents contained trade secrets.

137.   Southeast knew that the documents contained trade secrets.

138.   Gott knew, or had reason to know, Young had acquired Argos' confidential information through improper means.

139.   Southeast knew, or had reason to know, Young had acquired Argos' confidential information through improper means.

140.   Southeast has used the documents as a basis for a lawsuit against Argos and, upon information and belief, to obtain business in competition with Argos.

141.   The extraordinary means by which Young sought to avoid detection when he downloaded, copied, duplicated, photographed, or otherwise stole Argos' trade secrets demonstrates Young's intent to convert that information to his own ends.

142.   Young photographed many of the documents because he knew what he was doing was wrong and did not want to be caught.

143.   When he originally downloaded, copied, duplicated, photographed, or otherwise stole Argos' trade secrets, concealed those trade secrets, and communicated or delivered those trade secrets to others, Young intended to convert those trade secrets for his economic benefit and for the benefit of others as well as cause injury to Argos.

144.   Young believed he could profit by having lawsuits brought against Argos and by offering information to its competitor and his new employer, Southeast.

145.   Young intended that Moss would profit at Argos' expense by bringing lawsuits against the company, and Young even recruited plaintiffs on Moss's behalf.

146.   When he delivered the documents to Gott and Southeast, he intended that his new employer would be able to profit at Argos' expense by suing the company and also would be able to use the stolen information to compete against Argos.

147.   He intended that the provision of the stolen documents would advance his career with Southeast.

148.   Southeast accepted the stolen documents from Young.

149.   Southeast promoted Young to President of two large markets.

150.   Though Young initially claimed that he stole Argos' trade secrets for the purposes of reporting or investigating a crime, this clearly was not Young's purpose.

151.   Much of the information Young stole had nothing to do with any allegations in his *qui tam* action.

152.   Much of the information Young stole had nothing to do with any allegations that could support the product liability action.

153.   Young retained and concealed information even after the dismissal of his *qui tam* action, and he provided stolen trade secrets to Southeast.

154.   Young and Southeast's misappropriation is ongoing and continuing.

155.   Argos consequently and proximately has suffered compensable harm as a result of Young's theft.  These injuries have included the company's costs in defending against the lawsuits, its loss of reputation, its loss of business, and the expenses it incurred in investigating the theft of its data.

**COUNT TWO**
Georgia Trade Secrets Act (Against Young and Southeast)
Ga. Code Ann. § 10-1-760 *et seq.*

156.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

157.   In the course of its business operations, Argos develops a substantial amount of information that is confidential, proprietary, and valuable.

158.   This information includes technical and nontechnical data, formulae, product mixes, methods, techniques, and production plans related to its research, design, development, and manufacture of proprietary branded cement and concrete mixes.

159.   The information also includes confidential marketing strategies, financial data, financial plans, pricing, profit margins, costs and lists of actual or potential customers and suppliers.

160.   This confidential information is not commonly known by or available to the public.

161.   This confidential information is not readily ascertainable by reasonable means.

162.   Argos derives actual or potential economic value from the information not being generally known to others who might derive economic value from its use.

163.   Keeping this information confidential gives Argos a competitive edge in its industry and market.

164.   Argos takes reasonable steps to secure the information's confidentiality.

165.   Employees are required to take steps to ensure that Argos' confidential information is not made available outside the company.

166.   Argos expressly prohibits its employees from copying the company's confidential proprietary information without a Network Administrator's prior affirmative authorization.

167.   Argos restricts access to the Network to authorized employees.

168.   When an employee is terminated, Argos immediately seizes and secures the employee's company-issued electronic devices to prevent his or her continued access to the Network.

169.   Argos limits who may access especially sensitive documents.

170.   During Young's employment as sales manager, Argos empowered him with authority to act on the company's behalf.

171.   Argos entrusted Young with a substantial amount of confidential and proprietary information.

172.   The nature of this confidential relationship imposed upon Young a duty to maintain secrecy and limit the use of Argos' confidential and proprietary information.

173.   This duty was implied by the nature of the fiduciary relationship between Young and Argos.

174.   This duty was also stated explicitly in Argos' ECP, which Young acknowledged receiving as a condition of his employment.

175.   Nevertheless, while present within the State of Georgia, Young acquired, copied, and retained Argos' trade secrets in breach of his confidential relationship with the company and in breach of his duty to maintain the secrecy and limit the use of its confidential and proprietary information.

176.   Young further used additional, improper means to acquire this information, including theft, misrepresentation, and espionage.

177.   Young later disclosed this confidential information to his new employer, Southeast, which competes in the same industry against Argos.

178.   Southeast knew, or had reason to know, the information constituted a trade secret.

179.   Southeast knew, or had reason to know, Young had acquired the trade secret information by improper means.

180.   Southeast used the trade secret information to file the antitrust lawsuit against Argos.

181.   Upon information and belief, Southeast used the trade secret information to compete with Argos.

182.   Young and Southeast's misappropriation is ongoing and continuing.

183.   Argos has suffered financial harm as a result of the misappropriation and use of its trade secrets.  The misappropriation and use of Argos' trade secrets has diminished its ability to compete for customers.  Also, the continued use of Argos' trade secrets to instigate and support a number of lawsuits has subjected Argos to substantial litigation costs and harmed the business's reputation with its customers.

**COUNT THREE**
South Carolina Trade Secrets Act (Against Young and Southeast)
S.C. Code Ann. § 39-8-10 *et seq.*

184.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

185.   As part of its business operations, Argos develops a substantial amount of information that is confidential, proprietary, and valuable.

186.   This information includes technical and nontechnical data, formulae, product mixes, methods, techniques, and production plans related to its research, design, development, and manufacture of proprietary branded concrete and cement mixes.

187.   The information also includes confidential marketing strategies, financial data, financial plans, pricing, profit margins, costs, and lists of actual or potential customers and suppliers.

188.   This confidential information is not commonly known by or available to the public.

189.   This confidential information is not readily ascertainable by reasonable means.

190.   Argos derives actual or potential economic value from the information not being generally known to others who might derive economic value from its use.

191.   Keeping this information confidential gives Argos a competitive edge in its industry and market.

192.   Argos takes reasonable steps to secure that information's confidentiality.

193.   Employees are required to take steps to ensure that Argos' confidential information is not made available outside the company.

194.   Argos expressly prohibits its employees from copying the company's confidential proprietary information without a Network Administrator's prior affirmative authorization.

195.   Argos restricts access to the Network to authorized employees.

196.   When an employee is terminated, Argos immediately seizes and secures the employee's company-issued electronic devices to prevent his or her continued access to the Network.

197.   Argos limits who may access especially sensitive documents.

198.   During Young's employment as sales manager, Argos empowered him with authority to act on the company's behalf.

199.   As part of that relationship, Argos entrusted Young with a substantial amount of confidential and proprietary information.

200.   The nature of this confidential relationship imposed upon Young a duty to maintain secrecy and limit the use of Argos' confidential and proprietary information.

201.   This duty was implied by the nature of the fiduciary relationship between Young and Argos.

202.   This duty was also stated explicitly in Argos' ECP, which Young acknowledged receiving as a condition of his employment.

203.   Nevertheless, while present in the State of South Carolina, Young acquired, copied, and retained Argos' trade secrets in breach of his confidential relationship with the company and in breach of his duty to maintain the secrecy and limit the use of its confidential and proprietary information that was physically and digitally stored in South Carolina.

204.   Young further used additional, improper means to acquire this information, including theft, misrepresentation, and espionage.

205.   Young later disclosed this information to his new employer, Southeast, which competes in the same industry against Argos.

206.   Southeast knew, or had reason to know, the information constituted a trade secret.

207.   Southeast knew, or had reason to know, Young had acquired the trade secret information by improper means.

208.   Southeast used the trade secret information to file the antitrust lawsuit against Argos.

209.   Upon information and belief, Southeast used the trade secret information to compete with Argos.

210.   Young and Southeast's misappropriation is continuing and ongoing.

211.   Argos has suffered financial harm as a result of the misappropriation and use of its trade secrets.  The misappropriation and use of Argos' trade secrets has diminished its ability to compete for customers.  Also, the use of Argos' trade secrets to instigate and support a number of lawsuits has subjected Argos to substantial litigation costs and harmed the business's reputation with its customers.

### COUNT FOUR
Computer Fraud and Abuse Act (Against Young)
18 U.S.C. § 1030(g)

212.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

213.   Argos' ECP expressly prohibits employees from copying and retaining company emails beyond a standard retention period without prior authorization.

214.   The ECP likewise expressly prohibits employees from copying information from the company's Network without the prior authorization of a Network Administrator.

215.   Young knew about these policies during his employment at Argos.

216.   Argos gave a copy of the policy to Young, who acknowledged it and agreed to abide by it as a condition of his employment as a sales manager at the company.

217.   Young frequently violated the scope of his authorized computer access and use by copying, photographing, and otherwise retaining confidential and proprietary emails beyond their retention period.

218.   Young frequently violated the scope of his authorized computer access and use by photographing, copying, or otherwise duplicating Argos' confidential documents and information from the company's computer systems.

219.   Young accessed these documents without a business reason for doing so.

220.   Young maintained these documents without a business reason for doing so.

221.   The extraordinary means that Young employed to keep Argos from learning about his theft of the company's proprietary information from the Network

establishes that Young knew that the company had never authorized his conduct but had, in fact, expressly prohibited it.

222.   Young copied, photographed, duplicated, and retained Argos' confidential and proprietary documents with the intention of taking or appropriating those copies.

223.   Young hid the documents he stole in his truck and at his home.

224.   Young used the information he stole to harm Argos.

225.   Young fomented lawsuits against the company using its confidential information, subjecting the business to substantial litigation expenses and reputational harm.

226.   He also used the information to benefit one of Argos' competitors and his new employer, Southeast, undermining Argos' ability to compete in Georgia and South Carolina.

227.   Young used the information to undermine Argos' reputation with its customers in Georgia and South Carolina.

228.   Argos consequently and proximately has suffered compensable harm as a result of Young's theft.  These injuries have included the company's costs in defending against other lawsuits, its loss of reputation, its loss of business, and the expenses it incurred in investigating the theft of its data.

229.   These losses exceed $5,000 in the aggregate.

## COUNT FIVE

Georgia Computer Systems Protection Act (Against Young)
Ga. Code Ann. § 16-9-93(a)

230.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

231.   Argos' ECP expressly prohibits employees from copying and retaining company emails beyond the standard retention period without prior authorization.

232.   The ECP likewise expressly prohibits employees from copying information from the Network without the prior authorization of a Network Administrator.

233.   Young knew about these policies during his employment at Argos.

234.   Argos gave a copy of the policy to Young, who acknowledged it and agreed to abide by it as a condition of his employment as a sales manager at the company.

235.   Nevertheless, while present in the State of Georgia, Young frequently exceeded and violated the scope of his authorized computer access and use by copying, photographing, and otherwise retaining confidential and proprietary emails beyond their retention period.

236.   Young frequently violated the scope of his authorized computer access and use by photographing, copying, or otherwise duplicating Argos' confidential documents and information from the company's computer systems.

237.   Young accessed these documents without a business reason for doing so.

238.   Young maintained these documents without a business reason for doing so.

239.   The extraordinary means that Young employed to keep Argos from learning about his theft of the company's proprietary information from the Network establishes that Young knew that the company had never authorized his conduct but had, in fact, expressly prohibited it.

240.   Young copied, photographed, duplicated, and retained Argos' confidential and proprietary documents with the intention of taking or appropriating those copies.

241.   Young used the information he stole to harm Argos.

242.   He fomented lawsuits against the company using its confidential information, subjecting the business to substantial litigation expenses and reputational harm.

243.   He also used the information to benefit one of Argos' competitors and his new employer, Southeast, undermining Argos' ability to compete in Georgia.

244.   Young used the information to undermine Argos' reputation with its customers in Georgia.

245.   Argos consequently and proximately has suffered compensable harm as a result of Young's theft.  These injuries have included the company's costs in defending against other lawsuits, its loss of reputation, its loss of business, and the expenses it incurred in investigating the theft of its data.

**COUNT SIX**
South Carolina Computer Crimes Act (Against Young)
S.C. Code Ann. § 16-16-10 *et seq.*

246.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

247.   Argos' ECP expressly prohibits employees from copying and retaining company emails beyond the standard retention period without prior authorization.

248.   The ECP likewise expressly prohibits employees from copying information from the Network without the prior authorization of a Network Administrator.

249.   Young knew about these policies during his employment at Argos. Argos gave a copy of the policy to Young, who acknowledged it and agreed to abide by it as a condition of his employment as a sales manager at the company.

250.   Nevertheless, while present in the State of South Carolina, Young frequently exceeded the scope of his authorized computer access and use by copying, photographing, and otherwise retaining confidential and proprietary emails beyond their retention period.

251.   Young frequently violated the scope of his authorized computer access and use by photographing, copying, or otherwise duplicating Argos' confidential documents and information from the company's computer systems.

252.   The extraordinary means that Young employed to keep Argos from learning about his theft of the company's proprietary information from the Network establishes that Young knew that the company had never authorized his conduct but had, in fact, expressly prohibited it.

253.   Young copied, photographed, duplicated, and retained Argos' confidential and proprietary documents with the intention of taking or appropriating those copies.

254.   Young used the information he stole to harm Argos.

255.   He used the confidential information to instigate and assist lawsuits against the company, subjecting the business to substantial litigation expenses and reputational harm.

256.   He also used the information to benefit one of Argos' competitors and his new employer, Southeast, undermining the company's ability to compete in South Carolina.

257.   Young used the information to undermine Argos' reputation with its customers in South Carolina.

258.   Argos consequently and proximately has suffered compensable harm as a result of Young's theft.  These injuries have included the company's costs in defending against other lawsuits, its loss of reputation, its loss of business, and the expenses it incurred in investigating the theft of its data.

## COUNT SEVEN
Civil Conspiracy – Georgia (Against Young)

259.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

260.   Moss and Young together agreed to a common design or scheme to injure Argos.

261.   The two agreed that they would use stolen information to harm Young's employer, Argos, by generating a number of lawsuits against the company.

262.   Young's role in this scheme was to steal Argos' confidential and proprietary information and provide it to Moss.

263.   Young was able to use his position to create additional documents that he later stole, including privileged internal communications with Argos' counsel and the company's work product.

264.   Young also agreed to recruit plaintiffs, including Nunn, who could pursue claims against Argos using the information he stole.

265.   Moss, in turn, retained the illicitly gathered information on Young's behalf, shielding it from disclosure by claiming that the materials were either privileged communications or protected under the work product doctrine.

266.   In the interim, Moss used the information to generate lawsuits against Argos, including the *qui tam* action and the product liability action.

267.   In the event one of those lawsuits was successful, Moss stood to realize a significant financial benefit in the form of attorneys' fees.

268.   Other attorneys, including Moore, eventually joined this scheme, knowingly using stolen documents to generate new claims against Argos and asserting attorney-client privilege or the work-product doctrine to conceal precisely what had been stolen.

269.   Like Moss, Moore stood to realize significant financial gain in the form of attorneys' fees in the event that one of the lawsuits was successful.

270.   Young, through Moss, provided Argos' confidential information to Southeast through its attorney and agent, Gott.

271.   Gott, on behalf of Southeast, used the stolen information to file a separate lawsuit against Argos—the antitrust action.

272.   All of the stolen documents are now under the control of Southeast, and, upon information and belief, Southeast and Young have used those documents to undermine Argos' competitive advantage and to interfere with Argos' business relationships with its customers.

273.   As a consequence of this conduct, Argos suffered compensable harms, including the costs of litigating the lawsuits, reputational damage, and loss of business.

**COUNT EIGHT**
Conversion (Against Young and Southeast)

274.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

275.   Argos possesses the right of possession of Argos' proprietary information and other property.

276.   Notwithstanding Argos' right of possession, and contrary to that right of possession, Young and Southeast, without authorization, took actual possession of Argos' proprietary information and other property and removed the same from Argos' possession.

277.   In July 2016, during Young's termination meeting, Argos made a demand for the return of all of Argos' proprietary information and other property.

278.   Young refused to return Argos' proprietary information and other property and instead stole additional proprietary information from the console of a truck belonging to Argos.

279.   Young and Southeast continue to exercise wrongful domination and control over Argos' proprietary information and other property.

280.   Argos served a subpoena on Young in the product liability action demanding production of all of the documents Young stole from Argos.

281.   Young's attorneys have refused to return Argos' proprietary information and other property.

282.   Southeast, through its agent and attorney Gott, is now in possession of the proprietary information and other property.

283.   Argos has demanded that Southeast return its proprietary information.

284.   Southeast has refused to return the proprietary information.

285.   Southeast has instead utilized the proprietary information and other property to file the antitrust action against Argos.

286.   Upon information and belief, Southeast has also utilized the proprietary information and other property to compete with Argos.

287.   Argos has been damaged by Young's conversion and by Southeast's conversation in an amount to be determined at trial.

**COUNT NINE**
Breach of Fiduciary Duty (Against Young)

288.   Argos reincorporates by reference the facts alleged in paragraphs 1 through 113, above.

289.   Young was both an employee and agent of Argos, his employer and principal.

290.   As a regional sales manager, Young had the authority to negotiate and enter into contracts on Argos' behalf.

291.   Young frequently sat on Argos' regional review board for the Savannah area and was provided access to confidential information related to Argos' finances, personnel decisions, and contracts.

292.   Argos entrusted Young to act as a liaison between the company, its customers, and third-party homeowners, allowing him access to confidential (and

sometimes privileged) information as he investigated and resolved complaints on the company's behalf.

293.   Young owed duties of loyalty and confidentiality to Argos.

294.   Young breached those duties by, among other things, copying, photographing, duplicating, or otherwise stealing Argos' confidential (and sometimes privileged) information.

295.   Young breached those duties by communicating that confidential (and sometimes privileged information) to his lawyer, Moss, who used the information to pursue various lawsuits against Argos.

296.   Young breached those duties by recruiting plaintiffs to sue Argos.

297.   Young also breached his duties of loyalty and confidentiality by disclosing Argos' confidential information to a competitor and his new employer, Southeast.

298.   As a consequence of this conduct, Argos suffered compensable harms, including the costs of litigating other lawsuits, reputational damage, and loss of business.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays for judgment in favor of Argos and against Defendants Chris Young and Southeast Ready Mix, LLC, as well as the following equitable relief and award of damages:

a.    Specific performance requiring Defendant Young and Southeast to return all copies of Argos' proprietary and confidential documents or other information that were taken or duplicated from Argos' computer systems without authorization;

b.    Injunctive relief, enjoining Defendant Young and Southeast from continuing to use or divulging Argos' trade secrets to other parties;

c.    Actual damages, to include injury to Argos' reputation among its customers and suppliers in Georgia and South Carolina, costs and fees associated with the additional lawsuits Argos has had to defend against, loss of business, and the value of its proprietary mix designs, trade secrets, and confidential information or a reasonable royalty for the trade secrets' use;

d.    Restitution;

e.    Treble damages;

f.    Statutory damages;

g.    Punitive damages;

h.    Attorneys' fees and costs; and

i.    Any and all such other and further legal and equitable relief as the Court

deems necessary, just, and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff respectfully requests trial by jury for all issues so triable.


ARGOS USA LLC

DATED:    June 7, 2018                    Respectfully submitted,

/s/ Kurt E. Lentz
Georgia Bar No. 804355
MCGUIREWOODS LLP
1230 Peachtree Street NE
Suite 2100, Promenade
Atlanta, GA 30309
Telephone: 404-443-5739
Telecopier: 404-443-5797
klentz@mcguirewoods.com
*Attorneys for Plaintiff Argos USA LLC*


103141968_1

55